UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, as successor in interest to NORTHBROOK EXCESS AND SURPLUS INSURANCE COMPANY f/k/a NORTHBROOK INSURANCE COMPANY, | ) ) ) ) | RECEIVED COPY SEPTEMBER 3 ,2008   08CV5033   JUDGE KENNELLY   MAGISTRATE JUDGE BROWN   NF |

ALLSTATE INSURANCE COMPANY, as
successor in interest to NORTHBROOK EXCESS
AND SURPLUS INSURANCE COMPANY f/k/a
NORTHBROOK INSURANCE COMPANY,

              Petitioner,

           v.

SENTRY INSURANCE A MUTUAL COMPANY

              Respondent.

)
)
)
)
)
)
)
)
)
)
)
)

RECEIVED COPY SEPTEMBER 3 ,2008
    08CV5033
    JUDGE KENNELLY
    MAGISTRATE JUDGE BROWN
    NF

Case No.

## DECLARATION OF NEAL R. NOVAK IN SUPPORT OF PETITION IN AID OF ARBITRATION

I, Neal R. Novak, depose and state under penalty of perjury, the following:

1.    I am one of counsel for Petitioner, ALLSTATE INSURANCE COMPANY as successor in interest to NORTHBROOK EXCESS and SURPLUS INSURANCE COMPANY f/k/a NORTHBROOK INSURANCE COMPANY ("Allstate") in this case.

2.    I have first-hand knowledge of the matters set forth herein and am therefore competent to testify thereto.

3.    I have been provided with copies of various reinsurance contracts by my client, including the Casualty Second Quota Share Reinsurance Agreement, also known as "Cession 125," at issue in this lawsuit. A true and accurate copy of Cession 125 is attached hereto as Exhibit A.

4.    On March 27, 2008, Allstate demanded arbitration against Respondent Sentry Insurance A Mutual Company ("Sentry") A true and accurate copy of Allstate's arbitration demand is attached hereto as Exhibit B.

5.    By letter dated April 25, 2008 to Allstate's in-house counsel, Edward I. Maslov, Sentry appointed Paul Aiudi as its party-appointed arbitrator. On May 5, 2008, the undersigned on

behalf of Allstate notified Sentry that it was appointing Richard L. Voelbel as its party-arbitrator in this matter.

6.      By letter dated June 16, 2008, the undersigned on behalf of Allstate notified Sentry that it will proceed to arbitration on the dispute under Cession 125.

7.      Beginning on May 24, 2007, Allstate submitted its first billing to Sentry in connection with the foregoing provisions of Cession 125. Allstate subsequently submitted additional billings in the total amount of $132,277.21. Attached hereto as Exhibit C is a true and accurate copy of Allstate's Statement of Account for Cession 125 as of January 30, 2008.

8.      On August 1, 2008, Allstate asked Sentry to direct its party arbitrator to immediately commence discussions with Allstate's party arbitrator aimed at selecting the third arbitrator pursuant to the selection process set forth in the arbitration clause. Attached hereto as Exhibit D is a true and accurate copy of an e-mail dated August 1 from the undersigned to counsel for Sentry.

9.      On August 4, Sentry responded. *Id.* On August 18, 2008, Allstate reiterated its request that Sentry's party-appointed arbitrator commence the selection process with Allstate's party-appointed arbitrator. *Id.* To date, Sentry has refused to engage in the process as set forth in the arbitration clause and the parties have not otherwise been able to agree to the terms of a modification to the selection process.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 3, 2008 at Chicago, Illinois.

_____
Neal R. Novak

**NOVAK LAW OFFICES**
Neal R. Novak, Esq. (#06181620)
Reid J. Rozen, Esq. (#6199084)
33 North LaSalle, Suite 1900
Chicago, IL 60602
(312) 425-2500
(312) 425-2525

# EXHIBIT A

CESSION
125

CASUALTY SECOND QUOTA SHARE
REINSURANCE AGREEMENT

(hereinafter referred to as "Agreement")

between

NORTHBROOK INSURANCE COMPANY
ALLSTATE INSURANCE COMPANY

(hereinafter referred to as the "Company")

and

(hereinafter referred to as "Reinsurers")

125

## ARTICLE 1

BUSINESS COVERED

Being a reinsurance in respect of all business classified as Umbrella Liability and Excess Liability Business which may accrue to the Company under its policies, binders, contracts of insurance or reinsurance or other evidences of liability, whether oral or written (hereinafter called "policies") hereafter issued or contracted for by Northbrook Insurance Company covering anywhere in the world subject to the exclusions set forth in Article 2 and other terms and conditions of this Agreement.

## ARTICLE 2

EXCLUSIONS

1. Railroads
2. Contractors involved in tunneling under pressure; blasting; construction of Dams, Bridges, Oil Refineries, Petrochemical Facilities and Utilities
3. Municipalities, except Mid-West Municipalities
4. Pharmaceutical Manufacturing and/or Distribution
5. Utilities
6. All business involving Oil Risks
7. Chemical Manufacturing
8. All Errors and Omissions including Malpractice
9. Aviation Accounts except Industrial Aid
10. Manufacturing of Aircraft Products
11. Directors & Officers Liability
12. Kidnap and Ransom
13. SEC Liability
14. Fidelity, Surety and Fiduciary Liability
15. Ocean Marine, written and classified as such
16. R.L. Jarrett business
17. Life, including Credit Life
18. Insolvency and Financial Guarantee
19. Credit Insurance
20. Assumed Reinsurance
21. War Risks
22. Participation in any pool or syndicate
23. Liability excluded under the provisions of the Nuclear Incident Exclusions Clause - Liability - Reinsurance as per clause attached.
24. Retro Contingency or Premium Penalty Business
25. Insolvency Funds, as per clause attached.

Notwithstanding the above, business covered under Exclusions 1 through 8 are covered hereunder whenever issued or contracted for an incidental portion of a policy, except when coded or classified by the Company as such.

125

Nevertheless in the event of the Company being interested on an excluded risk (other than in respect of items 17, 18, 19, 21, 22, 23 and 25 above), either by an existing insured extending its operations or by an inadvertent acceptance by an agency or otherwise, it is agreed that the Company shall nevertheless be indemnified to the same extent as if there were no exclusion but only until the Company is able to effect cancellation of such coverage and then not for more than forty-five days fom the date of discovery of such excluded risk by the underwriting officials at the Home Office.

## ARTICLE 3

### RETENTIONS AND LIMITS

A.   The Company shall cede under this Agreement and the Reinsurers shall accept by way of reinsurance 80% quota share of the business underwritten and produced by the Company.

B.   Cessions made hereunder shall be limited to a maximum of:

    (1)   $5,000,000 any one policy any one occurrence,

    (2)   $5,000,000 in the aggregate each annual period as respects Products Liability,

    (3)   $5,000,000 in the aggregate each annual period as respects Occupational Disease

excess of the first $5,000,000 of business covered hereunder irrespective of the Company's proportion.

The Company shall maintain net for its own account on each and every risk the remaining 20%.

The Company is permitted to maintain an Underlying Quota Share Reinsurance Agreement and a Supplementary Casualty Excess of Loss Reinsurance Agreement in respect of its net retained lines, which shall inure to its sole benefit and shall not in any way vitiate the retention warranted herein.

C.   The Company shall in all cases be the sole judge of what constitutes one risk.

## ARTICLE 4

### LOSS IN EXCESS OF ORIGINAL POLICY LIMITS

With respect to Third Party Liability Insurance of any kind, this Agreement shall protect the Company, within the limits hereof, in connection with any loss for which the Company may be legally liable to pay in excess of the limit of its original policy, such loss in excess of the limit having been incurred because of failure by it to settle within the policy limit or by reason of alleged or actual negligence, fraud or bad faith in rejecting an offer of settlement or in the preparation of the defense or in trial of any action against its Insured or Reinsured or in the preparation or prosecution of an appeal consequent upon such action.

ARTICLE 5

TERM AND CANCELLATION

A.   This Agreement shall take effect 12:01 a.m., August 1, 1977 and shall remain in force for an indefinite period but may be terminated any 12:01 a.m., July 1st, by either party giving to the other ninety (90) days' prior notice.

B.   In the event either party cancels in accordance with the above, the Reinsurers shall continue to participate in all insurances coming within the terms of this Agreement granted or renewed by the Company during the said ninety (90) days'.

C.   In the event of the termination of this Agreement it is agreed that the Reinsurers shall remain liable for all cessions in force at date of termination of this Agreement, however, the liability of the Reinsurers shall cease at the first anniversary dates next succeeding the date of termination but not to extend beyond twelve months after such date of termination. Notwithstanding the aforementioned in respect of policies written for an odd time greater than twelve months and policies that have had their expiration date extended, liability of the Reinsurers shall cease at the end of such odd time or extension as the case may be. However, in no event shall the run-off liability of Reinsurers extend for more than an additional 6 months in the case of policies with odd time expiration nor more than 90 days beyond the normal expiration in the case of policies whose expiration date has been extended, beyond the date of termination of this Agreement. Liability of the Reinsurers shall continue during any discovery period that has been granted in the original policies during any run-off period as stated above. The Reinsurers shall refund to the Company the unearned reinsurance premium applicable to the unexpired liability (calculated on the monthly pro rata basis) less the rate of commission allowed by the Reinsurers on such cessions. The Reinsurers will continue to be liable for their proportionate share of the outstanding losses under this Agreement.

D.   If any law or regulation of the Federal or State or Local Government of any jurisdiction in which the Company is doing business shall render illegal the arrangements made in this Agreement, the Agreement can be terminated immediately, insofar as it applies to such jurisdiction, by the Company giving notice to the Reinsurers to such effect.

ARTICLE 6

REINSURANCE FOLLOWS ORIGINAL POLICIES

All reinsurances for which the Reinsurers shall be liable by subscribing to this Agreement shall be subject in all respects to the same rates, terms, conditions, interpretations, waivers, the exact proportion of premiums paid to the Company and to the same modifications, alterations and cancellations as the respective insurances of the Company to which such reinsurances relate, the true intent of this Agreement being that the Reinsurers shall, in every case to which this Agreement applies, and in the proportion specified herein, follow the fortunes of the Company.

125

## ARTICLE 7

### LOSSES

A.    The Company alone and as its full discretion shall adjust, settle or compromise all claims and losses. All such adjustments, settlements, and compromises, including ex gratia payments, shall be binding on the Reinsurers in proportion to their participation. The Company shall likewise at its sole discretion commence, continue, defend, compromise, settle or withdraw from actions, suits or proceedings and generally do all such matters and things relating to any claim or loss as in its judgment may be beneficial or expedient, and all loss payments made and costs and expenses incurred shall be shared by the Reinsurers proportionately. Reinsurers shall on the other hand, benefit proportionately from all reductions of losses by salvages, compromise or otherwise.

B.    It is agreed that when the amount due from the Reinsurers as a result of any one loss exceeds $100,000 they will at the option and upon the demand of the Company pay by special remittance immediately upon receipt of a special loss account which shall be prepared by the Company and shall contained all relevant details in connection with the loss.

## ARTICLE 8

### LOSS EXPENSES

A.    The Reinsurers shall be liable for their proportionate share of all expenses incurred by the Company in connection with the investigation and settlement or contesting the validity of specific claims or losses or alleged losses (except as hereinafter provided).

B.    When the Company uses its own field employees or officials instead of outside adjusters to settle losses the Company shall be permitted to include a pro rata share of the salaries and expenses of the said field employees according to the time occupied in adjusting such losses, and also the expenses of said officials incurred in connection with the losses, but no salaries of such officials or any normal overhead charge, such as rent, postal, lighting, cleaning, heating, etc. shall be included.

## ARTICLE 9

### LOSS RESERVES

(Loss Reserves as per clause attached.)

## ARTICLE 10

### LOSS RESERVES INVOLVING CANADIAN DOLLARS

(applies only to those Reinsurers who do not qualify for credit by the Canadian authority having jurisdiction over the Company's loss reserves)

As regards policies or bonds issued by the Company coming within the scope of this Agreement, the Company agrees that when it shall file with the Canadian Insurance Authority or set up on its books reserves for losses covered hereunder which it shall be required to set up by law, it will forward to the Reinsurers a statement showing the proportion of such loss reserves which is applicable to them if so requested by the Company. The Reinsurers hereby agree that they will transmit to the Company an amount of Canadian Dollars equal to Reinsurer's proportion of said loss reserves.

The Company undertakes to use and apply any such amounts for the following purposes only:-

(a)    To pay the Reinsurers share or to reimburse the Company for the Reinsurers share of any liability for loss reinsured by this Agreement.

(b)    To make refund of any sum which is in excess of the actual amount required to pay Reinsurers share of any liability reinsured by this Agreement.

ARTICLE 11

PREMIUM AND COMMISSION

The Company shall pay to the Reinsurers a pro rata share of the original net earned premiums received by the Company less 5%.

The term "original net earned premiums" as used herein shall be understood to mean original gross earned premiums, less acquisition costs and less Federal Excise Tax, if applicable. It is further understood that total acquisition costs of the Company in respect of all policies covered hereunder shall not exceed 20%.

ARTICLE 12

REPORTS AND REMITTANCES

The Company shall furnish to the Reinsurers accounts current as soon as possible on a monthly basis. The balance shown to be due by said account shall be payable by the debtor party within 90 days after the close of the month accounted for.

The statistical details referred to above shall comprise:

(a)    Net premiums written and earned during the month less the rate specified in Article 11 and less losses paid.

(b)    Loss and losses expenses paid during the quarter summarized by major classes and segregated by years of occurrence.

(c)    Outstanding losses at the end of the month summarized by major classes and segregated into years of occurrence.

(d)    In force and unearned premiums at the end of the month summarized by major classes.

In addition, the Company shall furnish the Reinsurers a bordereaux of risks ceded during the month.

- 6 -

125

## ARTICLE 13

### CURRENCY

Wherever the word "Dollars" and the sign "$" appear in this Agreement, they shall be construed to mean United States Dollars.

For purposes of this Agreement, where the Company receives premiums or pays losses in currencies other than United States Currency, such premiums or losses shall be converted into United States Dollars at the actual rates of exchange at which these premiums and losses are entered in the Company's books.

## ARTICLE 14

### ACCESS TO RECORDS

(Access to Records as per clause attached.)

## ARTICLE 15

### FEDERAL EXCISE TAX

(Federal Excise Tax as per clause attached.)

## ARTICLE 16

### TAX

(Tax as per clause attached.)

## ARTICLE 17

### INSOLVENCY

(Insolvency as per clause attached.)

## ARTICLE 18

### ARBITRATION

(Arbitration as per clause attached.)

## ARTICLE 19

### SERVICE OF SUIT

(Service of Suit as per clause attached.)



## NUCLEAR INCIDENT EXCLUSION CLAUSE – LIABILITY – REINSURANCE

*[Wherever the word "Reassured" appears in this clause, it shall be deemed to read "Reassured", "Reinsured", "Company", or whatever other word is employed throughout the text of the reinsurance agreement to which this clause is attached to designate the company or companies reinsured.]*

(1) This reinsurance does not cover any loss or liability accruing to the Reassured as a member of, or subscriber to, any association of insurers or reinsurers formed for the purpose of covering nuclear energy risks or as a direct or indirect reinsurer of any such member, subscriber or association

(2) Without in any way restricting the operation of paragraph (1) of this Clause it is understood and agreed that for all purposes of this reinsurance all the original policies of the Reassured (new, renewal and replacement) of the classes specified in Clause II of this paragraph (2) from the time specified in Clause III in this paragraph (2) shall be deemed to include the following provision (specified as the Limited Exclusion Provision):

Limited Exclusion Provision.*
I.  It is agreed that the policy does not apply under any liability coverage,
    to { *injury, sickness, disease, death or destruction* / bodily injury or property damage } with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability.
II. Family Automobile Policies (liability only), Special Automobile Policies (private passenger automobiles liability only), Farmers Comprehensive Personal Liability Policies (liability only), Comprehensive Personal Liability Policies (liability only) or policies of a similar nature; and the liability portion of combination forms related to the four classes of policies stated above, such as the Comprehensive Dwelling Policy and the applicable types of Homeowners Policies.
III. The inception dates and thereafter of all original policies as described in II above, whether new, renewal or replacement, being policies which either
    (a) become effective on or after 1st May, 1960, or
    (b) become effective before that date and contain the Limited Exclusion Provision set out above; provided this paragraph (2) shall not be applicable to Family Automobile Policies, Special Automobile Policies, or policies or combination policies of a similar nature, issued by the Reassured on New York risks, until 90 days following approval of the Limited Exclusion Provision by the Governmental Authority having jurisdiction thereof

(3) Except for those classes of policies specified in Clause II of paragraph (2) and without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed that for all purposes of this reinsurance the original liability policies of the Reassured (new, renewal and replacement) affording the following coverages:
    Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability)
shall be deemed to include with respect to such coverages, from the time specified in Clause V of this paragraph (3), the following provision (specified as the Broad Exclusion Provision):

Broad Exclusion Provision *
It is agreed that the policy does not apply:
    I.  Under any Liability Coverage,  to { *injury, sickness, disease, death or destruction* / bodily injury or property damage }
        (a) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or
        (b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization
    II. Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating
        to { *immediate medical or surgical relief,* / first aid } to expenses incurred with respect
        to { *bodily injury, sickness, disease or death* / bodily injury } resulting from the hazardous properties of nuclear material
        and arising out of the operation of a nuclear facility by any person or organization.

- 1 -

III. Under any Liability Coverage, to { *injury, sickness, disease, death or destruction* / bodily injury or property damage } resulting from the hazardous properties of nuclear material, if

    (a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

    (b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

    (c) the { *injury, sickness, disease, death or destruction* / bodily injury or property damage } arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, mainte-nance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to { *injury to or destruction of property at such nuclear facility.* / property damage to such nuclear facility and any property thereat.

IV.  As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or byproduct material; "source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means

    (a) any nuclear reactor,

    (b) any equipment or device designed or used for (1) separating the isotopes of uranium or plu-tonium, (2) processing or utilizing spent fuel or (3) handling, processing or packaging waste,

    (c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

    (d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

{ *With respect to injury to or destruction of property, the word "injury" or "destruction"* / "property damage" includes all forms of radioactive contamination of property. / *includes all forms of radioactive contamination of property.*

V.  The inception dates and thereafter of all original policies affording coverages specified in this paragraph (3), whether new, renewal or replacement, being policies which become effective on or after 1st May, 1960, provided this paragraph (3) shall not be applicable to

    (i)  Garage and Automobile Policies issued by the Reassured on New York risks, or

    (ii)  statutory liability insurance required under Chapter 90, General Laws of Massachusetts until 90 days following approval of the Broad Exclusion Provision by the Governmental Authority having jurisdiction thereof.

(4)  Without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed that paragraphs (2) and (3) above are not applicable to original liability policies of the Reassured in Canada and that with respect to such policies this Clause shall be deemed to include the Nuclear Energy Liability Exclusion Provisions adopted by the Canadian Underwriters' Association or the Independent Insurance Conference of Canada.

---

*NOTE. The words printed in italics in the Limited Exclusion Provision and in the Broad Exclusion Provision shall apply only in relation to original liability policies which include a Limited Exclusion Provision or a Broad Exclusion Provision containing those words.

---

21/9/67

125

## INSOLVENCY FUNDS EXCLUSION CLAUSE

This Contract excludes all liability of the Company arising, by contract, operation of law, or otherwise, from its participation or membership, whether voluntary or involuntary, in any insolvency fund. "Insolvency fund" includes any guaranty fund, insolvency fund, plan, pool, association, fund or other arrangement, howsoever denominated, established or governed; which provides for any assessment of or payment or assumption by the Company of part or all of any claim, debt, charge, fee, or other obligation of an insurer, or its successors or assigns, which has been declared by any competent authority to be insolvent, or which is otherwise deemed unable to meet any claim, debt, charge, fee or other obligation in whole or in part.

NOTES:   Wherever used herein the terms:

"Company"    shall be understood to mean "Company", "Reinsured", "Reassured" or whatever other term is used in the attached reinsurance contract to designate the reinsured company or companies.

"Agreement"    shall be understood to mean "Agreement", "Contract", "Policy" or whatever other term is used to designate the attached reinsurance document.

"Reinsurers"    shall be understood to mean "Reinsurers", "Underwriters" or whatever other term is used in the attached reinsurance contract to designate the reinsurer or reinsurers.

1/1/76

## LOSS RESERVES

(This Clause is only applicable to those Reinsurers who cannot qualify for credit by the State having jurisdiction over the Company's loss reserves.)

As regards policies or bonds issued by the Company coming within the scope of this Agreement, the Company agrees that when it shall file with the Insurance Department or set up on its books reserves for losses covered hereunder which it shall be required to set up by law it will forward to the Reinsurers a statement showing the proportion of such loss reserves which is applicable to them. The Reinsurers hereby agree that they will apply for and secure delivery to the Company a clean irrevocable Letter of Credit issued by Citibank, N.A. in an amount equal to Reinsurers' proportion of said loss reserves.

The Company undertakes to use and apply any amounts which it may draw upon such credit pursuant to the terms of the Agreement under which the Letter of Credit is held, and for the following purposes only:-

(a)    To pay the Reinsurers' share or to reimburse the Company for the Reinsurers' share of any liability for loss reinsured by this Agreement.

(b)    To make refund of any sum which is in excess of the actual amount required to pay Reinsurers' share of any liability reinsured by this Agreement.

Citibank, N.A. shall have no responsibility whatsoever in connection with the propriety of withdrawals made by the Company or the disposition of funds withdrawn, except to see that withdrawals are made only upon the order of properly authorized representatives of the Company.

NOTES:    Wherever used herein the terms:

"Company"    shall be understood to mean "Company", "Reinsured", "Reassured" or whatever other term is used in the attached reinsurance contract to designate the reinsured company or companies.

"Agreement"    shall be understood to mean "Agreement", "Contract", "Policy" or whatever other term is used to designate the attached reinsurance document.

"Reinsurers"    shall be understood to mean "Reinsurers", "Underwriters" or whatever other term is used in the attached reinsurance contract to designate the reinsurer or reinsurers.

## INSOLVENCY CLAUSE

In the event of the insolvency of the Company, this reinsurance shall be payable directly to the Company, or to its liquidator, receiver, conservator or statutory successor on the basis of the liability of the Company without diminution because of the insolvency of the Company or because the liquidator, receiver, conservator or statutory successor of the Company has failed to pay all or a portion of any claim. It is agreed, however, that the liquidator, receiver, conservator or statutory successor of the Company shall give written notice to the Reinsurers of the pendency of a claim against the Company indicating the policy or bond reinsured which claim would involve a possible liability on the part of the Reinsurers within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership, and that during the pendency of such claim, the Reinsurers may investigate such claim and interpose, at their own expense, in the proceeding where such claim is to be adjudicated any defense or defenses that they may deem available to the Company or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurers shall be chargeable subject to the approval of the court, against the Company as part of the expense of conservation or liquidation to the extent of a pro rata share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurers.

Where two or more Reinsurers are involved in the same claim and a majority in interest elect to interpose defense to such claim, the expense shall be apportioned in accordance with the terms of the reinsurance Agreement as though such expense had been incurred by the Company.

The reinsurance shall be payable by the Reinsurers to the Company or to its liquidator, receiver, conservator or statutory successor, except as provided by Section 315 of the New York Insurance Law or except (a) where the Agreement specifically provides another payee of such reinsurance in the event of the insolvency of the Company, and (b) where the Reinsurers with the consent of the direct insured or insureds have assumed such policy obligations of the Company as direct obligations of the Reinsurers to the payees under such policies and in substitution for the obligations of the Company to such payees.

## TAX

In consideration of the terms under which this Agreement is issued, the Company undertakes not to claim any deduction of the premium hereon when making Canadian tax returns or when making tax returns, other than Income or Profits Tax returns, to any State or Territory of the United States of America or to the District of Columbia.

## FEDERAL EXCISE TAX

(applies only to those reinsurers, excepting Underwriters at Lloyd's, London and other reinsurers exempt from the Federal Excise Tax, who are domiciled outside the United States of America.)

The Reinsurers have agreed to allow for the purpose of paying the Federal Excise Tax 1% of the premium payable hereon to the extent such premium is subject to Federal Excise Tax.

In the event of any return of premium becoming due hereunder the Reinsurers will deduct 1% from the amount of the return and the Company or its agent should take steps to recover the Tax from the U.S. Government.

## ACCESS TO RECORDS

The Reinsurers or their duly accredited representative shall have free access to the books and records of the Company at all reasonable times for the purpose of obtaining information concerning this Agreement or the subject matter thereof.

NOTES: Wherever used herein the terms:
"Company" shall be understood to mean "Company", "Reinsured", "Reassured" or whatever other term is used in the attached reinsurance contract to designate the reinsured company or companies.
"Agreement" shall be understood to mean "Agreement", "Contract", "Policy" or whatever other term is used to designate the attached reinsurance document.
"Reinsurers" shall be understood to mean "Reinsurers", "Underwriters" or whatever other term is used in the attached reinsurance contract to designate the reinsurer or reinsurers.

6/71 2000

## ARBITRATION

As a precedent to any right of action hereunder, if any dispute shall arise between the Company and the Reinsurers with reference to the interpretation of this Agreement or their rights with respect to any transaction involved, whether such dispute arises before or after termination of this Agreement, such dispute, upon the written request of either party, shall be submitted to three arbitrators, one to be chosen by each party, and the third by the two so chosen. If either party refuses or neglects to appoint an arbitrator within thirty days after the receipt of written notice from the other party requesting it to do so, the requesting party may appoint two arbitrators. If the two arbitrators fail to agree in the selection of a third arbitrator within thirty days of their appointment, each of them shall name two, of whom the other shall decline one and the decision shall be made by drawing lots. All arbitrators shall be executive officers of insurance or reinsurance companies or Underwriters at Lloyd's, London not under the control of either party to this Agreement.

The arbitrators shall interpret this Agreement as an honorable engagement and not as merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law, and they shall make their award with a view to effecting the general purpose of this Agreement in a reasonable manner rather than in accordance with a literal interpretation of the language. Each party shall submit its case to its arbitrator within thirty days of the appointment of the third arbitrator.

The decision in writing of any two arbitrators, when filed with the parties hereto, shall be final and binding on both parties. Judgment may be entered upon the final decision of the arbitrators in any court having jurisdiction. Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other party the expense of the third arbitrator and of the arbitration. Said arbitration shall take place in the city in which the Company's Head Office is located unless some other place is mutually agreed upon by the Company and the Reinsurers.

## SERVICE OF SUIT

(Applies only to those Reinsurers who are domiciled outside the United States of America)

In the event of the failure of Reinsurers hereon or any of them to pay any amount claimed to be due hereunder, Reinsurers hereon, at the request of the Company, will submit to the jurisdiction of any Court of competent jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

Service of process in such suit may be made upon Messrs. Mendes and Mount, 3 Park Avenue, New York, N.Y. 10016, and in any suit instituted against any one of them upon this Agreement, Reinsurers will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above named are authorized and directed to accept service of process on behalf of Reinsurers in any such suit and/or upon the request of the Company to give a written undertaking to the Company that they will enter a general appearance on behalf of Reinsurers or any of them in the event such a suit shall be instituted.

125

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Reinsurers hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Company or any beneficiary hereunder arising out of this Agreement, and hereby designate the above named Mendes and Mount as the firm to whom the said officer is authorized to mail such process or a true copy thereof.

NOTES:     Wherever used herein the terms:

           "Company"       shall be understood to mean "Company", "Reinsured", "Reassured" or whatever other term is used in the attached reinsurance contract to designate the reinsured company or companies.

           "Agreement"   shall be understood to mean "Agreement", "Contract", "Policy" or whatever other term is used to designate the attached reinsurance document.

           "Reinsurers"  shall be understood to mean "Reinsurers", "Underwriters" or whatever other term is used in the attached reinsurance contract to designate the reinsurer or reinsurers.

125

## ADDENDUM NO. 1

## CASUALTY SECOND QUOTA SHARE
## REINSURANCE AGREEMENT

(hereinafter referred to as "Agreement")

between

## NORTHBROOK INSURANCE COMPANY
## ALLSTATE INSURANCE COMPANY

(hereinafter referred to as the "Company")

and

SENTRY INSURANCE - A MUTUAL COMPANY

(hereinafter referred to as "Reinsurers")

IT IS HEREBY MUTUALLY AGREED that effective 12:01 A.M., July 1, 1978, this Agreement is terminated in accordance with the terms and provisions as stated in ARTICLE 5 -- TERM AND CANCELLATION, paragraph C.

All other terms and conditions remain unchanged.

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be executed in duplicate this    14th    day of    December, 1978

**NORTHBROOK INSURANCE COMPANY**
**ALLSTATE INSURANCE COMPANY**

_____
R. L. Agnew, President, Northbrook Insurance Company

and on this  28th  day of  February, 1979

SENTRY INSURANCE - A MUTUAL COMPANY
#09-3855

_____
Robert E. Green
REINSURANCE UNDERWRITING MANAGER

INTERESTS AND LIABILITIES CONTRACT

to

CASUALTY SECOND QUOTA SHARE
REINSURANCE AGREEMENT

(hereinafter referred to as "Agreement")

between

NORTHBROOK INSURANCE COMPANY
ALLSTATE INSURANCE COMPANY

(hereinafter referred to as the "Company")

and

SENTRY INSURANCE – A MUTUAL COMPANY

(hereinafter referred to as "Subscribing Reinsurer")

It is hereby agreed by and between the Company, on the one part, and the
Subscribing Reinsurer, on the other part, that the Subscribing Reinsurer's
share in the Interests and Liabilities of the Reinsurers as set forth in the
"Casualty Second Quota Share Reinsurance Agreement" attached hereto
shall be  1.0%

The share of the Subscribing Reinsurer in the Interests and Liabilities of the
Reinsurers in respect of the said Agreement shall be separate and apart
from the shares of the other subscribing reinsurers to the said Agreement,
and the Interests and Liabilities of the Subscribing Reinsurer shall not be
joint with those of the other subscribing reinsurers and in no event shall the
Subscribing Reinsurer participate in the Interests and Liabilities of the other
subscribing reinsurers.

This Contract shall take effect 12:01 a.m., August 1, 1977 and shall continue
in effect until terminated in the same manner and subject to the same terms
of termination as are provided in Article 5, Term of the Casualty Second
Quota Share Reinsurance Agreement attached hereto.

125

IN WITNESS WHEREOF, the parties hereto have caused this Contract to be executed in duplicate by their duly authorized representatives this 21st day of August 1978.

NORTHBROOK INSURANCE COMPANY
ALLSTATE INSURANCE COMPANY

_____
Vice President

and on this 6th day of October 1978.

SENTRY INSURANCE - A MUTUAL COMPANY
#09-3855

_____
Robert E. Evans
REINSURANCE UNDERWRITING MANAGER

- 2 -

# EXHIBIT B



# Allstate.
### You're in good hands.

**Edward I. Maslov**
Counsel

Law & Regulation Department
Specialty Operations Law Division

March 27, 2008

**SENT BY DHL EXPRESS**
Ms. Mary Higgins and Ms. Kathy Niemi
Sentry Insurance A Mutual Company
1800 North Point Drive
Post Office Box 8020
Stevens Point, WI 54481-8020

Re:  **Allstate Insurance Company, individually and as successor in interest to Northbrook Excess and Surplus Insurance Company (formerly Northbrook Insurance Company), petitioner, v. Sentry Insurance A Mutual Company, respondent**
**Demand for Arbitration and Request for Appointment of Arbitrator**

Dear Ms. Higgins and Ms. Niemi:

Sentry Insurance A Mutual Company ("Sentry") reinsured Allstate Insurance Company and Northbrook Excess and Surplus Insurance Company (formerly Northbrook Insurance Company) ("NESCO") under certain Reinsurance Treaties: NESCO Treaty Nos. 105, 116, 121, 125, 131, 134, 137 and 701, Allstate Casualty Excess of Loss Retrocessional Agreement R1A 1028 0000513G00 1981, 0000547G00 1982 and 0001024G00 1983, Allstate Property Facultative Quota Share Treaty Nos. 0000661G00 1980 and 0000661G00 1981, and Allstate First Casualty-Excess of Loss Retrocession Agreement Nos. 0104208G00 1983 and 0104208G00 1984 (the "Treaties"). Allstate Insurance Company, individually and as successor in interest to NESCO ("Allstate"), has repeatedly called upon Sentry to pay outstanding balances of $341,108.35 due Allstate under the Treaties as reflected in Exhibit A. To date, however, Sentry has refused to make payment.

Allstate hereby demands arbitration against Sentry pursuant to the Arbitration clauses of the Treaties. Allstate serves this arbitration demand directly upon Sentry by express mail at Sentry's address listed above. Allstate also serves this arbitration demand upon Sentry through Aon Re Inc. (Treaty Nos. 0000513G00 1981, 0000547G00 1982 and 0001024G00 1983), Towers Perrin Forster & Crosby (Treaty Nos. 0104208G00 1983 and 0104208G00 1984) and Guy Carpenter & Company (Treaty Nos. 0000661G00 1980 and 0000661G00 1981) as Intermediaries.

In arbitration, Allstate will seek resolution of all disputes arising under the Treaties. Allstate will seek relief including but not limited to the following: (1) payment of the outstanding balance due under the Treaties in the amount of $341,108.35 as reflected in Exhibit A, as well as further amounts that become due under the Treaties that are not timely paid by Sentry during the pendency of the arbitration; (2) interest on all unpaid amounts; (3) costs for in-house attorney fees and any outside attorney fees incurred by Allstate in the arbitration; and (4) such other relief as the Arbitration Panel may award.

March 27, 2008
Page 2

Pursuant to the Arbitration clauses of the Treaties, Allstate hereby requests that Sentry appoint its arbitrator within thirty days of Sentry's receipt of this Demand for Arbitration and Request for Appointment of Arbitrator. Should Sentry fail to appoint its arbitrator within that time, Allstate will appoint an arbitrator for Sentry pursuant to the terms of the Arbitration clauses of the Treaties. Allstate intends to abide strictly by all the terms and conditions of the Treaties and will agree to no extensions of time.

Allstate suggests that the parties agree to resolve all disputes under the Treaties in a single consolidated arbitration proceeding. If Sentry insists on separate arbitrations under each Treaty, please consider this letter to constitute a separate Demand for Arbitration and Request for Appointment of Arbitrator under each Treaty listed in Exhibit A.

Please direct all future phone calls and correspondence on this matter directly and only to the undersigned.

Very truly yours,

Edward I. Maslov

EIM/sh
Attachments

**Copy sent by DHL Express to:**
Ms. Michelle Bloom
Guy Carpenter & Company
121 River Street
Hoboken, NJ 07030-5792

Ms. Lori Taylor
Aon Re Inc.
7230 McGinnis Ferry Road, Suite 300
Suwanee, GA 30024-1287

Ms. Bernice Flynn
Towers Perrin Forster & Crosby
15000 Market Street
Centre Square East
Philadelphia, PA 19103-7501

## EXHIBIT A

### SENTRY INSURANCE A MUTUAL COMPANY
### TOTAL PAID RECOVERABLES AS OF 01/30/08

| NESCO CESSION NOS. | PAID RECOVERABLES |
|---|---|
| 105 | $19,772.48 |
| 116 | $22,428.56 |
| 121 | $11,694.21 |
| 125 | $132,277.21 |
| 131 | $3,162.48 |
| 134 | $22,439.38 |
| 137 | $220.84 |
| 701 | $29.89 |
| | |
| **TOTAL NESCO PAID RECOVERABLES** | **$212,025.05** |
| | |
| **ALLSTATE CASUALTY EXCESS OF LOSS RETROCESSIONAL AGREEMENT RIA 1028** | |
| 0000513G00  1981 | $41,828.22 |
| 0000547G00  1982 | $27,586.92 |
| 0001024G00  1983 | $25,000.70 |
| | |
| **ALLSTATE PROPERTY FACULTATIVE QUOTA SHARE TREATY** | |
| 0000661G00  1980 | $470.14 |
| 0000661G00  1981 | (.59) |
| | |
| **ALLSTATE FIRST CASUALTY-EXCESS OF LOSS RETROCESSION AGREEMENT** | |
| 0104208G00  1983 | $4,188.65 |
| 0104208G00  1984 | $30,009.26 |
| | |
| **TOTAL ALLSTATE PAID RECOVERABLES** | **$129,083.30** |
| | |
| | |
| **TOTAL ALLSTATE AND NESCO PAID RECOVERABLES** | **$341,108.35** |

ref:  emsentrychart

# EXHIBIT C

Allstate Insurance Company
Statement of Account- Sentry Insurance-Recoverables
As of January 30, 2008

## BALANCE DUE

| RECO | REINSURER'S NAME | CESSION | INTER | POLICY | CLAIM | DOL | LOSS DESCRIPTION | INSURED'S NAME | PROOF DATE | TOTAL RECOVERABLE BALANCE |
|---|---|---|---|---|---|---|---|---|---|---|
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 001601 | 0023 | 01/01/1978 | ASBESTOS B.I. | TRANSAMERICA CORP | 12/19/2007 | $42,947.03 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 001601 | 0023 | 01/01/1978 | ASBESTOS B.I. | TRANSAMERICA CORP | 12/28/2007 | $1,905.42 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003575 | 0005 | 09/30/1977 | ASBESTOS B.I. | CLARK EQUIPMENT CO | 06/28/2007 | $5.20 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003575 | 0005 | 09/30/1977 | ASBESTOS B.I. | CLARK EQUIPMENT CO | 12/28/2007 | $25.04 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003630 | 0003 | 10/01/1977 | ASBESTOS B.I. | KAISER CEMENT & GYPSUM CORP | 06/28/2007 | $21.40 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003630 | 0003 | 10/01/1977 | ASBESTOS B.I. | KAISER CEMENT & GYPSUM CORP | 12/28/2007 | $42.30 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003806 | 0002 | 01/01/1978 | HEARING LOSS | INGERSOLL RAND CO | 06/23/2007 | -$0.10 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003806 | 0002 | 01/01/1978 | HEARING LOSS | INGERSOLL RAND CO | 12/28/2007 | -$0.08 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003806 | 0015 | 01/01/1978 | ASBESTOS B.I. | INGERSOLL RAND CO | 06/28/2007 | $4.20 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003806 | 0015 | 01/01/1978 | ASBESTOS B.I. | INGERSOLL RAND CO | 12/28/2007 | $1.88 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003873 | 0003 | 01/01/1978 | ASBESTOS B.I. | KIMBERLY-CLARK CORP | 06/28/2007 | $2.17 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003873 | 0003 | 01/01/1978 | ASBESTOS B.I. | KIMBERLY-CLARK CORP | 12/28/2007 | $4.61 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003873 | 0005 | 01/01/1978 | POLLUTION P.D. | KIMBERLY-CLARK CORP | 06/28/2007 | $0.92 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003873 | 0005 | 01/01/1978 | POLLUTION P.D. | KIMBERLY-CLARK CORP | 12/28/2007 | $0.46 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003874 | 0047 | 01/01/1978 | ASBESTOS B.I. | STUDEBAKER WORTHINGTON INC | 06/28/2007 | $33.31 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003874 | 0047 | 01/01/1978 | ASBESTOS B.I. | STUDEBAKER WORTHINGTON INC | 12/28/2007 | $50.01 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003874 | 0052 | 01/01/1978 | ASBESTOS B.I. | STUDEBAKER WORTHINGTON INC | 06/28/2007 | $32.06 |
| 00411 | SENTRY INSURANCE | 000125 | 01322 | 003874 | 0052 | 01/01/1978 | ASBESTOS B.I. | STUDEBAKER WORTHINGTON INC | 06/28/2007 | $16.06 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003874 | 0052 | 01/01/1978 | ASBESTOS B.I. | STUDEBAKER WORTHINGTON INC | 12/28/2006 | $11.44 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003874 | 0055 | 01/01/1978 | ASBESTOS B.I. | STUDEBAKER WORTHINGTON INC | 12/28/2007 | $11.69 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003913 | 0003 | 01/01/1978 | ASBESTOS B.I. | BORG WARNER CORP | 06/28/2007 | $64.03 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 003913 | 0003 | 01/01/1978 | ASBESTOS B.I. | BORG WARNER CORP | 12/28/2007 | $98.56 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 004225 | 0008 | 03/01/1978 | ASBESTOS B.I. | I C INDUSTRIES INC | 08/28/2007 | $6.79 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 004225 | 0008 | 03/01/1978 | ASBESTOS B.I. | I C INDUSTRIES INC | 12/28/2007 | $0.20 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 004225 | 0016 | 03/01/1978 | ASBESTOS B.I. | I C INDUSTRIES INC | 06/28/2007 | $18.65 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 004225 | 0016 | 03/01/1978 | ASBESTOS B.I. | I C INDUSTRIES INC | 12/28/2007 | $13.38 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 004376 | 0006 | 04/01/1978 | ASBESTOS B.I. | TRANSAMERICA CORP | 12/19/2007 | $42,044.85 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 004376 | 0006 | 04/01/1978 | ASBESTOS B.I. | TRANSAMERICA CORP | 12/28/2007 | $1,885.50 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 004566 | 0001 | 05/01/1978 | ASBESTOS B.I. | DUTCH BOY INC | 05/24/2007 | $42,000.00 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 004566 | 0001 | 05/01/1978 | ASBESTOS B.I. | DUTCH BOY INC | 06/28/2007 | $1,021.63 |
| 00411 | SENTRY INSURANCE | 000125 | 00411 | 004566 | 0001 | 05/01/1978 | ASBESTOS B.I. | DUTCH BOY INC | 12/28/2007 | $6.03 |
| | | Total | | | | | | | | $132,277.21 |

# Exhibit D

## Novak, Neal R.

**From:**     Novak, Neal R.
**Sent:**      Monday, August 18, 2008 11:24 AM
**To:**         'Farrish, Thomas O.'
**Cc:**         'dfitzmaurice@daypitney.com'; Maslov, Edward
**Subject:** Sentry/Allstate

Tom – We are done discussing this. On August 1, we made a proposal (see below) of going straight by the language of the arbitration clause since neither side is permitted any greater rights than what are provided under the clause. Your August 4 response is also below, and you note that at "some point in the arbitration, presumably at an organizational meeting, Sentry will…" state its claim and seek disclosure of any bias that would prevent the third arbitrator from serving impartially. Agreed. Let's now ask the party appointeds to move forward with selection process without questionnaires and with both sides reserving their rights to present their views at the org meeting.

Please advise Mr. Aiudi of this approach and we will do likewise with Mr. Voelbel and thereafter they can proceed with the selection of the third arbitrator.

*Neal Novak*
Novak Law Offices
33 North LaSalle Street Suite 1900
Chicago, IL 60602
312.425.2500
312.425.2525 (Fax)

---

**From:** Farrish, Thomas O. [mailto:tofarrish@daypitney.com]
**Sent:** Monday, August 04, 2008 3:40 PM
**To:** Novak, Neal R.
**Cc:** FitzMaurice, Daniel L.
**Subject:** RE: Sentry/Allstate

Neal:

We are surprised by your proposal, since it was Allstate that first proposed that the parties employ umpire questionnaires. Evidently Allstate thought at the time that they were a useful tool, and Sentry certainly agreed. We therefore don't interpret your proposal as progress, but instead view it as undoing what little we've been able to agree upon.

With that said, and without expressing any view on your comments about the contract or the arbitration case law, we ask you to consider the practical implications of your proposal. Imagine that Messrs. Aiudi and Voelbel are willing to embark upon the umpire selection process without benefit of questionnaire responses. Imagine further that they succeed in identifying an umpire. At some point in the arbitration, presumably at an organizational meeting, Sentry will (a) state the nature of its claims, including its defense of setoff, and (b) ask the umpire to disclose any circumstances that would prevent him or her from serving impartially or from rendering an unbiased award. Allstate will, of course, have its opportunity to explain why it thinks Sentry's setoff defense should not be heard in this arbitration. In sum, though, the practical effect of your proposal is that the parties will separately state their views on the nature of the dispute and on the propriety of Sentry's setoff defense, and inquire about umpire conflicts - which is exactly what Sentry proposed in my e-mail of July 29th.

Since we will end up at the same place in terms of disclosures relative to Sentry's defenses, why not start out with each side stating their respective position and get the responses in a manner that is more effective for both sides (we each get to see the responses up front) and potentially far less costly.

9/3/2008

Thomas Farrish
Day Pitney LLP
242 Trumbull St | Hartford  CT 06103 | *t* 860 275 0397 | *f* 860 275 0343
TOFarrish@DayPitney.com    www.DayPitney.com


*******************************
IRS Circular 230 Notice: Any tax advice provided here is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties that may be imposed on any taxpayer
*******************************

-----Original Message-----
**From:** Novak, Neal R. [mailto:novak@novakjuris.com]
**Sent:** Friday, August 01, 2008 10:05 AM
**To:** Farrish, Thomas O.
**Cc:** FitzMaurice, Daniel L.; Maslov, Edward
**Subject:** Sentry/Allstate

Tom – I've discussed this further with Allstate and we see no hope of resolving this dispute with Sentry. As you know, the parties are afforded no greater right than what is provided for in the written arbitration agreement itself. *See, e g., Universal Re Corp v  Allstate Ins. Co*, 16 F.3d 125 (7th Cir. 1994).  In our case, the agreement does not provide for questionnaires and therefore neither party has the right to employ one or to insist that one be used in the umpire selection process. In fact, the clause does not even provide for the appointment of an umpire but, rather, calls for "the selection of a third arbitrator" by the two party appointed arbitrators. As such, Allstate asks that you direct Mr. Aiudi to immediately commence discussions with Mr. Voelbel aimed at selecting the third arbitrator.

This should put this matter back on track and avoid the unnecessary cost of seeking judicial intervention. Please let me know that we are in agreement with this approach. If you disagree, please provide me with some authority to support whatever alternative position you may advocate.

*Neal Novak*
Novak Law Offices
33 North LaSalle Street Suite 1900
Chicago, IL 60602
312 425 2500
312 425 2525 (Fax)